## THE BEHERA.*

*(District Court, E. D. Pennsylvania. March 11, 1881.)*

1. ADMIRALTY—CRUSHING OF BARGE IN DOCK BETWEEN TWO STEAM-SHIPS—LISTING OF STEAM-SHIP AGROUND WITH FALL OF TIDE—BURDEN OF PROOF.

A barge was forced into a dock at high water between two steam-ships. Upon the fall of the tide one of the steam-ships listed over towards the other, and the barge was crushed between them. The testimony showed that the movement of the steam-ship was caused by the fact that she was aground, and consequently, upon the fall of the tide, listed over towards the other, and that this could not have been prevented by any care on the part of those in charge of her. *Held*, that it was probable from the testimony that the barge was guilty of imprudence in entering the dock, but that, admitting the propriety of her doing so, she could not recover, since the evidence failed to show that the accident could have been prevented by those in charge of the steam-ship.

Libel by James Ward against the steam-ship Behera to recover damages for injuries to libellant's barge. The facts were as follows: The iron steam-ship Behera, 248 feet long and 34 feet 8 inches beam, having on board 1,750 tons of old rails, and drawing 22 feet aft and 20 feet forward, went into the dock at pier 39, Delaware river, Philadelphia, on June 7, 1880. On the opposite side of the dock, which was 85 feet wide, the Matthew Curtis, an iron steam-ship, 290 feet long, 33 to 35 feet beam, was lying, empty. On the same day libellant's barge arrived off pier 39 with coal for the Curtis. At 1 o'clock on the next day, at high water, the barge was pushed in between the steam-ships, and commenced unloading its cargo into the Curtis. There was so little space in the dock that it was with some difficulty that the barge was forced in. When the tide fell the barge became jammed between the two steam-ships and was crushed. Libellant alleged that when the barge was pushed into the space between the steam-ships the Behera was afloat and yielded to the pressure; that her mate offered a line to the barge, and promised to breast the steam-ship nearer to the wharf;

*Reported by Frank P. Prichard, Esq., of the Philadelphia bar.

that he failed to do this, and that in consequence of this neglect, and of the lines of the Behera being slack, she swung into and crushed the barge.

The respondents alleged that the Behera entered the dock at high water, and had then to be forced in on the mud; that, owing to the bank at the side of the dock, it was impossible to moor her close to the wharf, but that her bow projected into the dock at an angle; that she was at all times aground, and with each fall of the tide listed over towards the Curtis; that when the barge entered the dock, her captain was warned by the mate of the Behera that she would be jammed; that the lines of the Behera were taut, and that the accident could not have been avoided by any care on the part of respondents.

There was evidence that the dock had a short time before the accident been cleaned out to a depth of from 21 to 24 feet at high tide, but that a city sewer emptied into it close to where the Behera was lying.

*Edward F. Pugh* and *Henry Flanders*, for libellant.

*Henry G. Ward*, for respondents.

BUTLER, D. J. That the libellant was guilty of imprudence in taking his barge into the dock, between the two large steam-ships lying there, seems more than probable. He had been present, awaiting opportunity to enter, for nearly twenty-four hours, and had seen the situation of the ships at low water—lying close together, their bows almost touching. He knew, as his witness, the stevedore, testifies, that he could only get in at high water, and that as the tide ran out the Behera would "list," and press over towards the Curtis. When he entered, (at high water,) the space between the ships was insufficient to admit him, without forcing a way between them. The testimony of the stevedore, as well as his own, shows that he knew he could only remain while the water was up; and that he was doubtful of the safety of being there at all. In addition to this, the weight of the evidence, in my judgment, justifies a belief that he was warned from the Behera, before entering, that it would be unsafe to do so. I attach no importance to the circumstance

that he was offered a line from the Behera, when struggling to get in, and had become jammed; nor to what is said respecting a promise to "breast over."

But admitting the propriety of entering, the evidence still does not, in my judgment, sustain the libellant's claim to compensation, for his loss. The burden of proof rests upon him. He must show that the respondent could have kept off. The evidence not only does not do this, but, in my judgment, shows the contrary. I think it proves, with reasonable certainty, that the Behera was aground, from the time she entered until she left. The witnesses from aboard her, who alone can speak with certainty, all testify she was. The master of her tug says she was dragged in on the mud; and this was at high water. What the libellant's witnesses say respecting it, is little, if any, more than conjecture. They, generally, judge she was afloat, because they "pried her over" in pushing the barge in. It seems more probable that their effort to do this forced the Curtis (she being light) away. Although the latter vessel is said to have been moored close to the pier, it is not probable she was so close as to prevent the movement suggested. Again: the Behera's draft, forward, was 20 feet. The dock, according to the owner's testimony, had a depth when cleaned out, a few months before, of 21 to 24 feet, at high water. It would not be safe to put it above the lower of these figures; and this would be correct only when applied to the center, and parts mentioned by the assessor. Allowing for the ordinary accumulation of mud, with the increase produced by the sewer discharged where the ship lay, it is quite reasonable to believe that the depth there at high water, was less than the Behera's draft.

That the Behera had a "list" towards the Curtis, almost from the time of entering, is clear. The libellant's witnesses agree she had when the tide was down. When it was up she would straighten, until nearly even, and settle over as the water lowered. That such would be her position and action, when aground at the side of the channel, might reasonably be expected. The shelving bank at the side of the dock,

created by the support left for the pier when cleaning out, and the accumulation of mud, would tend directly to this result, if it would not necessarily produce it. In addition to this, however, the officers of the Behera, and of the tug, say there was such a bank, especially towards the front, so extensive as to force the ship several feet from the pier, on entering. These officers further testify that she "took a slight list" soon after going in, which increased as the water went down, breaking several of her lines, and carrying her over, forward, to within about three feet of the Curtis. This was her experience before the barge entered. Forced in, as it was, at high water, with no room to spare at that time, it required but a very slight increase of the Behera's "list," to bring her weight against the barge, and crush it. The libellant says he experienced no difficulty for an hour or more after entering; but when the water was running down he discovered that the Behera was pressing over; and soon after he was fast. The ship was simply repeating her movements of the preceding day and night. To his statement that the pressure was first against the lower part of his vessel—intended to show that the ship was not careening—I attach no importance. That she was careening, almost from the time of entering the dock, is fully proved. That she would do so, as the tide ran out, must I think, have been inferred, in the absence of the direct evidence produced. It is not probable the libellant paid such particular attention to the manner in which the vessels came together, as would enable him to speak with accuracy on the subject. The fact had no such significance at the time, as was calculated to arrest his attention. If, however, the statement is accurate, it does not prove, or materially tend to prove, that the ship was not careening. Where the vessels would first touch, if she was, would depend upon the shape of their hulls, and the position of the barge,— of which we are not informed. The latter may have careened towards the Curtis; and in view of the work being done on that side, it is not improbable she did—(it is certain the Curtis careened to her); and this of itself might produce the situation described. That the immediate cause of the disaster

was the careening or "listing" of the Behera, I am fully convinced. That this careening could not be prevented is clear. There was no force at command sufficient to overcome the combined weight of the vessel and cargo, as she went over from the bank, with the receding tide. Had the cables been so taut as to allow of no motion without something giving way, something would have given way,—posts, cables, bits or side of vessel. I do not find anything to justify a belief that the officers of the Behera were guilty of any fault, contributing to the disaster. They, as well as the crew, swear she was as close to the pier as she could go; and no one can safely assert that she was not. What the libellant's witnesses say on the subject seems to be little more than guessing. In the absence of direct evidence, the *presumption* would be that she would go as near as she could, on entering. It was her interest to do so, as she intended discharging there. The circumstance that she did not get near enough to discharge, and was compelled to go elsewhere for this purpose, is persuasive evidence to the same effect.

The libellant's loss must, therefore, be regarded as the consequence, alone, of his own imprudence in entering the dock, under the circumstances, or of remaining there so long. It is proper to say that even if the Behera had floated at high water, and might consequently have been moored closer for a time, the result, in my judgment, must have been the same. So soon as the ship touched the bottom she would have slid off in the mud, and careening over, have crushed the barge. That she would have touched bottom before the time at which the disaster occurred,—if afloat at high water,—I have no doubt. The tide had then been running down for over an hour and must have fallen two feet.

The answer to Captain Hewitt to whom, as assessor, interrogatories were addressed, will be filed herewith.

The court addressed to an assessor called as a nautical expert interrogatories which with the answers thereto were as follows:

*First.* Supposing the statements of the libellant and Mr.

Lovett the stevedore, to be correct, as respects the situation of the ships in the dock, was it prudent to take the barge in between them, and to remain after the tide had commenced to run down? *Answer.* The libellant was very imprudent in going into the dock under the circumstances which he and Mr. Lovett the stevedore describe. He should have expected to get fast. If he stayed any length of time he almost certainly would.

*Second.* Are the bottoms of docks usually level from side to side, affording an equal depth of water throughout? Describe their usual condition in this respect. *Answer.* The docks when first dug or cleaned are deepest near the middle. The earth is not removed, to the same extent near the foundations of the piers. The effect of vessels settling in the mud as the tide goes down at the sides of the dock, is to slide off and form a bed and at this place on each side the water will usually be found deepest pretty soon after the dock has been constructed or cleaned out. This bed will be formed from 20 to 25 feet from the pier; the vessel in going on the bottom will slip from the pier, the condition of the bank formed near the foundation throwing her off as she settles.

*Third.* Considering the Behera's size and draft, (20 feet forward) and her cargo, (1700 tons) was it practicable to keep her close to the pier? *Answer.* It was not practicable to keep the Behera up to the pier. If she floated at high water she could be breasted close; but as soon as the tide ran down sufficiently to let her touch the bottom she would slip off in the mud and then probably list over. I have no doubt of this. No fasts would keep her up after she ceased to float; her weight would be on them and something must break.

*Fourth.* In an hour and a quarter after the water reached its height, how much would it fall off? *Answer.* The tide would fall at least two feet and most probably two and a half feet in an hour and a quarter after it had reached its height.